**COMMODITY FUTURES TRADING COMMISSION, Plaintiff-Appellee,**

**v.**

**John J. MULLER, Defendant-Appellant.**

**No. 77–1823**
**Summary Calendar.***

United States Court of Appeals,
Fifth Circuit.

April 10, 1978.

* Rule 18, 5 Cir.; see *Isbell Enterprises, Inc. v. Citizens Casualty Co. of New York et al.*, 5 Cir., 1970, 431 F.2d 409, Part I.

Mark J. Friedman, Miami Beach, Fla., for defendant-appellant.

Richard E. Nathan, Frederic T. Spindel, Associate Gen. Counsel, Joanne Leveque, Howard L. Schwartz, John G. Gaine, Gen. Counsel, Commodity Futures Trading Com'n, Washington, D. C., for plaintiff-appellee.

Before THORNBERRY, RONEY and HILL, Circuit Judges.

RONEY, Circuit Judge:

Having charged John J. Muller, an employee of a commodity option firm, with misappropriating customers' funds, the Commodity Futures Trading Commission, a federal regulatory agency, sought and obtained a federal court preliminary injunction against Muller's concealing or disposing of his assets. Muller appeals from the injunction on two grounds: *first*, the regulatory agency has no jurisdiction over the London commodity options he sells because they are not specifically enumerated in the statute and are in foreign, not interstate, commerce and, *second*, the agency failed to present a *prima facie* case of illegal conduct or the reasonable likelihood of future violations. Holding that the Commission has jurisdiction not only over options in specifically enumerated commodities, but over *all* other commodity option transactions, including Muller's "London commodity options," and that the evidence was sufficient to support the injunction, we affirm.

Muller, vice president and director of Economic Research Analysts Commodities, Inc., sold "London commodity options" to the public. A "London commodity option" is a contractual right to buy or sell a specified futures contract for a particular commodity traded on the London markets, at a specified price within a specified period of time. There are two London commodity markets on which options are traded: "hard" commodities, like gold, silver and other metals, traded on the London Metal Exchange; and "soft" commodities, like cocoa, grain, coffee, rubber and sugar, traded through the International Commodities Clearing House.[1]

The Commission charged Muller with fraudulently converting and misappropriating for his own use funds entrusted to his care by customers of the commodity option firm by which he was employed, in violation of the Commodity Futures Trading Commission Act of 1974, 7 U.S.C.A. § 6c(b), and antifraud Regulation 32.9, 17 C.F.R. § 32.9 (1977). Muller makes essentially two arguments that these London commodity options, in which his customers were dealing, are not within the regulatory power of the Commission.

First, Muller argues such options are not subject to the regulatory authority conferred by 7 U.S.C.A. § 6c(b), which he contends authorizes the Commission to regulate only option transactions involving those agricultural commodities that are explicitly enumerated in § 2 of the Act.[2] The enumeration does not include the commodities sold through the London markets.

The restrictive interpretation urged by Muller is foreclosed by the wording of the Act and its legislative history. Prior to the passage of this Act, the Commodity Exchange Act did apply only to certain agricultural commodities that were specifically enumerated in § 2. It totally banned option transactions in these commodities. The 1974 Act was passed to fill the regulatory gaps in commodities trading.[3] It expanded the definition of "commodity" to include, in addition to those commodities expressly enumerated, "all other goods and articles . . . and all services, rights

1. For a further description of the commodity options industry, and London options in particular, *see generally British American Commodity Options Corp. v. Bagley*, 552 F.2d 482, 484–485 (2d Cir.), *cert. denied*, — U.S. —, 98 S.Ct. 427, 54 L.Ed.2d 297 (1977); *Commodity Futures Trading Commission v. J. S. Love & Assoc. Options, Ltd.*, 422 F.Supp. 652, 654 n.6 (S.D.N.Y.1976).

2. The agricultural commodities specifically enumerated in § 2's definition of "commodity" are

> wheat, cotton, rice, corn, oats, barley, rye, flaxseed, grain sorghums, mill feeds, butter, eggs, Solanum tuberosum (Irish potatoes), wool, wool tops, fats and oils (including lard, tallow, cottonseed oil, peanut oil, soybean oil and all other fats and oils), cottonseed meal, cottonseed, peanuts, soybeans, soybean meal, livestock, livestock products, and frozen concentrated orange juice . . . .

3. For a discussion of the history of the Act, *see generally British American Commodity Options Corp. v. Bagley*, 552 F.2d 482, 485–486 (2d Cir.), *cert. denied*, — U.S. —, 98 S.Ct. 427, 54 L.Ed.2d 297 (1977); *Commodity Futures Trading Commission v. J. S. Love & Assoc. Options, Ltd.*, 422 F.Supp. 652, 658–659 (S.D.N.Y.1976); [1974] U.S.Code Cong. & Admin. News 5844.

and interests in which contracts for future delivery are presently or in the future dealt in . . . ." 7 U.S.C.A. § 2. The Act continues the Commodity Exchange Act's ban on all option transactions involving the specifically enumerated agricultural commodities. *Id.* § 6c(a).[4] In addition, however, § 6c(b) subjects option transactions in non-enumerated commodities to regulations promulgated by the Commission.[5] The Act clearly applies to option transactions in non-enumerated commodities.

Muller next argues that these London options involve *foreign* commerce and are outside of the statute and regulations, which only apply to transactions involving *interstate* commerce. The Act's definition of "interstate commerce" is sufficiently expansive to include the London options. The Act broadly defines "interstate commerce" as commerce between any state, territory, possession, the District of Columbia, "*and any place outside thereof.*" 7 U.S.C.A. § 2. Section 3, which elaborates on when a transaction shall be considered to be in interstate commerce, defines state as including territory, the District of Columbia, possession of the United States, and foreign nation. 7 U.S.C.A. § 3. Thus, when these sections are read together, it is apparent that the jurisdiction of the Commission is sufficiently broad to encompass transactions involving foreign commerce, such as the London options. *Cf. British American Commodity Options Corp. v. Bagley,* 552 F.2d 482 (2d Cir.) (London options impliedly found by the Second Circuit to be within the jurisdiction of the Commission), *cert. denied,* — U.S. —, 98 S.Ct. 427, 54 L.Ed.2d 297 (1977).

The Commission has exercised this broad authority through the regulations it has promulgated under its delegated rulemaking authority. Antifraud Regulation 32.9, 17 C.F.R. § 32.9 (1977), applies to "any commodity option transaction."[6] This would include the full scope of the Act, including transactions involving foreign commerce.

Muller challenges the jurisdiction of the district court to enjoin him from using any funds in his personal or business accounts before the civil action at hand has been decided or terminated.

The Commodity Futures Trading Commission is authorized by 7 U.S.C.A. § 13a–1 to institute an action in federal district

4. Section 6c(a) provides:

It shall be unlawful for any person to offer to enter into, enter into, or confirm the execution of, any transaction involving any commodity . . . .

. . . . .

(B) if such transaction involves any commodity specifically set forth in section 2 of this title, prior to the enactment of the Commodity Futures Trading Commission Act of 1974, and if such transaction is of the character of, or is commonly known to the trade as, an "option", "privilege", "indemnity", "bid", "offer", "put", "call", "advance guaranty", or "decline guaranty" . . . .

5. Section 6c(b) provides:

No person shall offer to enter into, enter into, or confirm the execution of, any transaction subject to the provisions of subsection (a) of this section *involving any commodity regulated under this chapter, but not specifically set forth in section 2 of this title,* prior to the enactment of the Commodity Futures Trading Commission Act of 1974, which is of the character of, or is commonly known to the trade as, an "option", "privilege", "indemnity", "bid", "offer", "put", "call", "advance guaranty", or "decline guaranty", contrary to any rule, regulation, or order of the Commission prohibiting any such transaction or allowing any such transaction under such terms and conditions as the Commission shall prescribe . . . . (emphasis added).

6. Regulation 32.9, 17 C.F.R. § 32.9 (1977) provides:

It shall be unlawful for any person directly or indirectly—

(a) to cheat or defraud or attempt to cheat or defraud any other person;

(b) to make or cause to be made to any other person any false report or statement thereof or cause to be entered for any person any false record thereof;

(c) to deceive or attempt to deceive any other person by any means whatsoever;

in or in connection with an offer to enter into, or the confirmation of the execution of, *any commodity option transaction.* (emphasis added).

This general antifraud provision was patterned after the Security and Exchange Commission's Rule 10b–5. *See Commodity Futures Trading Commission v. J. S. Love & Assoc. Options, Ltd.,* 422 F.Supp. 652, 658–659 (S.D.N.Y.1976).

court whenever it appears that violations of any provision of the Act have occurred.[7] That section provides that upon a proper showing, the district court may issue a permanent or temporary injunction.

It has long been recognized that in an action brought to enforce the requirements of remedial statutes such as this Act, a district court has broad discretion to fashion appropriate relief. In actions for a statutory injunction, the agency need not prove irreparable injury or the inadequacy of other remedies as required in private injunctive suits. A *prima facie* case of illegality is sufficient. *Commodity Futures Trading Commission v. British American Commodity Options Corp.*, 560 F.2d 135, 141–142 (2d Cir. 1977), *petition for cert. pending*, 46 U.S.L.W. 3438 (Jan. 10, 1978); *Commodity Futures Trading Commission v. J. S. Love & Assoc. Options, Ltd.*, 422 F.Supp. 652, 661 (S.D.N.Y.1976).

Muller contends the Commission must show that he has engaged in illegal conduct and that there is a "reasonable likelihood" of future violations. For the issuance of the present injunction, however, it is not necessary for the Commission to show that new funds might be misappropriated. If the Commission had been seeking an injunction against "future violations" of the Act by Muller, it might be necessary to show this. The injunction here, however, does not enjoin defendant from continuing violations by misappropriating customer funds, but rather prevents defendant from further dissipating the funds he allegedly has already misappropriated. The district court has inherent power as a court of equity to order such temporary, ancillary relief in order to preserve the status quo so that an ultimate decision for the Commission could be effective. *SEC v. Manor Nursing Centers, Inc.*, 458 F.2d 1082, 1105–1106 (2d Cir. 1972); *SEC v. R. J. Allen & Assoc., Inc.*, 386 F.Supp. 866, 881 (S.D.Fla. 1974).

In this case, Muller advised his employer, Economic Research, that he had made arrangements with Commodity Analysis, Inc. for the purchase of London options for Economic's customers, and that Commodity Analysis had opened a bank account in Southeast First National Bank of Miami, Florida. In fact, Muller had not entered into any agreement with Commodity Analysis on Economic's behalf, nor did Commodi-

7. Section 13a–1 provides:

*Action to enjoin or restrain violations; compliance; writs and orders; jurisdiction and venue; process*

Whenever it shall appear to the Commission that any contract market or other person has engaged, is engaging, or is about to engage in any act or practice constituting a violation of any provision of this chapter or any rule, regulation, or order thereunder, or is restraining trading in any commodity for future delivery, the Commission may bring an action in the proper district court of the United States or the proper United States court of any territory or other place subject to the jurisdiction of the United States, to enjoin such act or practice, or to enforce compliance with this chapter, or any rule, regulation or order thereunder, and said courts shall have jurisdiction to entertain such actions: *Provided*, That no restraining order or injunction for violation of the provisions of this chapter shall be issued ex parte by said court. Upon a proper showing, a permanent or temporary injunction or restraining order shall be granted without bond. Upon application of the Commission, the district courts of the United States and the United States courts of any territory or other place subject to the jurisdiction of the United States shall also have jurisdiction to issue writs of mandamus, or orders affording like relief, commanding any person to comply with the provisions of this chapter or any rule, regulation, or order of the Commission thereunder, including the requirement that such person take such action as is necessary to remove the danger of violation of this chapter or any such rule, regulation, or order: *Provided*, That no such writ of mandamus, or order affording like relief, shall be issued ex parte. Any action under this section may be brought in the district wherein the defendant is found or is an inhabitant or transacts business or in the district where the act or practice occurred, is occurring, or is about to occur, and process in such cases may be served in any district in which the defendant is an inhabitant or wherever the defendant may be found. In lieu of bringing actions itself pursuant to this section, the Commission may request the Attorney General to bring the action. Where the Commission elects to bring the action, it shall inform the Attorney General of such suit and advise him of subsequent developments.

ty Analysis have an account in the Miami bank. Rather, Muller himself had opened that account in the name of Commodity Analysis. Checks in excess of $263,000 were issued by Economics to this Commodity Analysis—Muller bank account. Muller supplied Economic with fictitious confirmation purchase statements from Commodity Analysis to conceal his fraud. Muller used the money from the account to purchase commodity future contracts, in his wife's maiden name, from two brokerage firms. By the time the case came to court, the Commission reported that less than $20,000 remained in this account.

Having concluded that the option transactions were covered by the Act and that the Commission had presented a strong *prima facie* showing that defendant had violated 7 U.S.C.A. § 6c(b) and Regulation 32.9, the district court enjoined defendant, or anyone connected with him, from concealing or disposing of his assets in any manner, except that defendant could withdraw not more than $1,000 during any 30 day period for his necessary living expenses. This temporary freeze of defendant's assets was reasonably necessary to assure that the court's jurisdiction would not be defeated by the defendant's disposition of assets in the event the court should ultimately order disgorgement of the allegedly misappropriated funds. Defendant had already lost a large amount of the funds through his unsuccessful personal trading in commodity futures. He refused to assist the court in locating the remaining funds. Under these circumstances, the district court did not abuse its discretion in preventing defendant from dissipating his assets pending resolution of the case.

AFFIRMED.